**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 23-cv-01614-NYW-MDB

JOHN PIERRE FRENCH,

      Plaintiff,

v.

DENVER PUBLIC SCHOOLS,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Defendant's Motion to Dismiss (the "Motion" or "Motion to Dismiss") [Doc. 19]. The Court has reviewed the Motion, the Parties' briefing, and the applicable case law, and concludes that oral argument would not materially assist in the resolution of the Motion. For the reasons set forth in this Order, the Motion to Dismiss is respectfully **GRANTED**.

## BACKGROUND

### I.     Factual Allegations

The Court draws the following facts from Plaintiff's Complaint and Jury Demand (the "Complaint"), [Doc. 1], and presumes they are true for purposes of this Order, except to the extent that they are contradicted by documents that are central to the claims.[1] *See*

---

[1] The Court also considers two documents attached to the Motion to Dismiss: (1) DPS Board of Education Policies, [Doc. 19-1]; and (2) a letter dated February 7, 2022, from Hayley Ames to Plaintiff John Pierre French (the "Close-Out Letter"), [Doc. 19-2]. In ruling on a motion to dismiss under Rule 12(b)(6), a court "may . . . consider documents attached to or referenced in the complaint if they 'are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Brokers' Choice of Am., Inc. v. NBC*

*Corrigan v. Bd. of Trs. of Metro. State Univ. of Denver*, No. 19-cv-02475-CMA-NYW, 2020

WL 3567049, at *4 (D. Colo. July 1, 2020) (citing *GFF Corp. v. Assoc. Wholesale Grocers,*

*Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) (observing that "[i]f the factual allegations of a

complaint contradict a properly considered document attached to a motion to dismiss,

then the factual allegations are not well-pleaded, and a court does not have to take them

as true").

Defendant Denver Public Schools ("Defendant" or "DPS") is a K-12 public school

district in Denver County, Colorado.  [Doc. 1 at ¶¶ 4, 11.  Plaintiff John Pierre French

("Plaintiff" or "Mr. French") is a 59-year-old Black man who taught at Bruce Randolph

School (or "Bruce Randolph"), a DPS school. [*Id.* at ¶ 11].  In his roles at Bruce Randolph,

Mr. French worked as a guest teacher, basketball coach, paraprofessional, and hall

monitor.  [*Id.* at ¶¶ 10, 12].  Mr. French was a "great team member."  [*Id.* at ¶ 13].  In Fall

2021, Mr. French was described to Bruce Randolph staff members as "always willing to

jump in to support students, cover classes, cover In School Suspension, and more," and

was celebrated for "being such a great team member and wanting what's best for

students."  [*Id.*].

**Student Harassment at Bruce Randolph.**  Bruce Randolph teachers describe

school administrators as "using Hispanic students to do their 'dirty work.'"  [*Id.* at ¶ 16].

Mr. French claims administrators "used aggressive [Hispanic] students with multiple

incidences of violence and threats to harass and intimidate Mr. French."  [*Id.*].  Students

who were "good with" school security could harass and threaten Bruce Randolph staff

---

*Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).  Plaintiff does not dispute the authenticity of the exhibits and refers to both documents in his Complaint.  *See, e.g.*, [Doc. 1 at ¶¶ 55, 129].

members with impunity. [*Id.* at ¶ 31]. DPS security officers failed to respond to staff members' calls for help when trapped in dangerous situations with those students. [*Id.* at ¶ 32]. DPS security officer Randy Walker ("Mr. Walker"), with support from Dean of Culture Joseph Kidane ("Dean Kidane"), failed to respond to Mr. French's calls for help with armed students. [*Id.* at ¶ 22. Because DPS security officers, including Mr. Walker,[2] underreported incidents involving violence, hate speech, and weapons to the Department of Safety, students were effectively permitted to harass Mr. French. [*Id.* at ¶¶ 31, 32].

For instance, students called Mr. French racial slurs multiple times per week but were never reprimanded. [*Id.* at ¶ 17]. These slurs included the "n-word" and sometimes "B**** a** n*****."[3] [*Id.*]. At some point, Mr. Walker and Dean Kidane reportedly laughed at and mocked the use of racially derogatory terms toward Mr. French. [*Id.* at ¶ 33]. Students were also allowed to make physical contact with Mr. French. [*Id.* at ¶ 20]. On one such occasion, after a student pushed him, Mr. French lost his balance and nearly hit his head. [*Id.* at ¶ 21]. Mr. French was told by his supervisor, Assistant Principal Juanita Valdez, that he wasn't allowed to report students physically attacking him. [*Id.*]. When Mr. French discussed reporting the pushing incident to DPS security with Assistant Principal Valdez, she said, "you can't say that." [*Id.* at ¶¶ 20–21].

In or about 2021, Mr. French informed unnamed supervisors at Bruce Randolph that he was going to report "discriminatory treatment" to district officials. [*Id.* at ¶ 30].

---

[2] Paragraph 31 also refers to "Ms. Anderson" as underreporting incidents, without any additional explanation of her role at Bruce Randolph School and/or DPS. [Doc. 1 at ¶ 31]. The Complaint also does not include any other reference to Ms. Anderson. *See generally* [*id.*].

[3] This Court respectfully declines to fully quote the derogatory phrases from the Complaint.

***False Allegations by Students Against Mr. French.***   DPS Principal Melissa Boyd ("Principal Boyd") and Dean Kidane "foster[ed] an environment where students could make false allegations against staff with impunity."  [*Id.* at ¶ 58].  Mr. French was the victim of three separate instances of false accusations by students.  [*Id.* at ¶¶ 56–58].

At an unspecified time, a female student told her mother that Mr. French was keeping her after school for inappropriate reasons, and the mother contacted the school.  [*Id.* at ¶ 56].  Dean Kidane knew the report was false because he "saw the student with her boyfriend" and noted that the student was "always with her boyfriend after school," but still allowed the student's false allegations to be part of Mr. French's record.  [*Id.*].  Dean Kidane declined to intervene when Mr. French asked that he call the student's mother.  [*Id.*].  Dean Kidane also failed to report the false allegation per DPS protocol, and the student who falsely accused Mr. French was not disciplined.  [*Id.*].

On another unspecified occasion, Mr. French was accused of touching a student in the Learning Center.  [*Id.* at ¶ 57].  When Principal Boyd learned of the accusations, she said that Mr. French "doesn't touch kids, doesn't get involved in fights."  [*Id.*].  Even so, Principal Boyd did nothing more to protect Mr. French against the student's false allegations.  [*Id.*].  The falsity of the allegations was not reported, and the student was not disciplined.  [*Id.*].

On December 9, 2021, a female student at Bruce Randolph accused Mr. French of attempting to sexually assault her, commenting on female students' volleyball shorts, and commenting on female students "looking good."  [*Id.* at ¶ 34].  That day, Mr. French spoke to Denver Police about the alleged incidents, and Denver Police found the accusations groundless.  [*Id.*].  On December 10, 2021, Mr. French was placed on paid

administrative leave.  [*Id.* at ¶ 39].  Placement on administrative leave not only damaged his reputation and fueled the spread of rumors, but also interfered with Mr. French's coaching in unspecified ways.  [*Id.*].

The same day that Mr. French was placed on leave, the female student who accused Mr. French of attempted sexual assault recanted her accusations in the presence of the student's mother and someone identified as "Ms. Douglas Harris."  [*Id.* at ¶ 34].[4]  The student also admitted that her allegations against Mr. French were part of a conspiracy between students to get Mr. French fired.  [*Id.* at ¶ 35].  The student's mother stated, "I know when my daughter is lying and is not telling the truth" and discussed with Ms. Douglas Harris the impact that her daughter's false accusations could have on Mr. French.  [*Id.* at ¶¶ 35–36].

In response to the allegations, Mr. French provided four witnesses to Ms. Douglas Harris and a note from Bruce Randolph's athletic director.  [*Id.* at ¶¶ 37–38].  The witnesses and note all supported Mr. French's alibi and provided information indicating that he had been falsely accused.  [*Id.*].  However, DPS appeared to do nothing with the information provided by Mr. French.  [*Id.* at ¶ 38].

***"Everyone Knows What's Going on With Mr. French."***  Discussions and gossip about Mr. French's placement on administrative leave followed.  [*Id.* at ¶ 60].  Bruce Randolph leadership communicated with countless members of the school community that there were allegations against Mr. French and that he was placed on administrative leave.  [*Id.*].  While Mr. French was on administrative leave, Dean Kidane asked in a

---

[4] The Complaint does not provide information about "Ms. Douglas Harris" or her relationship to DPS or Mr. French whatsoever.

meeting, "everyone knows what's going on with Mr. French, right?"  [*Id.*].  Bruce Randolph administrators present when Mr. Kidane made this comment did nothing in response. [*Id.*].  Neither Dean Kidane nor Principal Boyd reported the previous instances of students asserting false allegations of sexual misconduct against Mr. French.  [*Id.* at ¶ 58].

Students openly boasted in front of Bruce Randolph teachers that students "got Mr. French fired and now [were] going to get Mr. Cordova fired."  [*Id.* at ¶ 40].  Bruce Randolph employees promptly reported these incidents to school administrators.  [*Id.*]. On at least four occasions, students spoke about Mr. French getting fired because he "touched girls."  [*Id.* at ¶ 62].  Those students were not disciplined.  [*Id.*].

***Regulations Governing DPS's Title IX Investigations.***  Title IX regulations require K-12 schools, like DPS, to equitably and promptly investigate sexual misconduct allegations to ensure a transparent, reliable adjudication process.  [*Id.* at ¶ 41].  Pursuant to Title IX, every educational institution that receives federal funding must have a Title IX coordinator who enforces Title IX compliance and manages Title IX reports and complaints.  [*Id.*].  DPS Board Policy AC-R3 governs the investigation and adjudication of Title IX claims raised by DPS students and employees.  *See* [Doc. 19-1].  Pursuant to that Board Policy AC-R3, the "Coordinator must remain responsive to the Parties throughout the Informal Resolution or Grievance Process, if applicable, to ensure that any measures implemented are necessary and effective."  [Doc. 1 at ¶ 53].

***Defendant's Title IX Investigation.***  DPS's Designated Title IX Coordinator, Hayley Ames ("Ms. Ames"), handled the investigation of the accusations against Mr. French.  [*Id.* at ¶¶ 42, 43].  Mr. French was never presented with any documents

explaining the allegations against him, procedural rules regarding the investigation, or his rights as a DPS employee during the course of the investigation.  [*Id.* at ¶ 45].

Ms. Ames waited six weeks after the student's accusations were made known to Bruce Randolph before contacting Mr. French regarding the same.  [*Id.* at ¶ 43].  On or around January 25, 2022, Ms. Ames finally emailed Mr. French, after hours, to request a meeting with him at 9:00 a.m. the next morning.  [*Id.*].  Mr. French requested, repeatedly, that Ms. Ames interview Mr. French's witnesses and colleagues about the incident.  [*Id.* at ¶ 44].  Ms. Ames never responded.  [*Id.*].  DPS also failed to even attempt to secure video footage capable of verifying the time and location that Mr. French entered the building on the day of the alleged assault.  [*Id.* at ¶ 47].

*The Close-Out Letter.*  On February 7, 2022, Mr. French received a "close-out" letter from Ms. Ames.  [*Id.* at ¶ 45; Doc. 19-2 at 1].  The Close-Out Letter listed the student complaint's three accusations against Mr. French and identified an "action step"—no longer using Mr. French as a guest teacher at Bruce Randolph—that she deemed "necessary":

> The Title IX Coordinator has confirmed that the below action steps will be sufficient to resolve the concerns described in the complaint and the Title IX Coordinator (or Designee) believe that no further action steps are necessary to end, correct the effects of, or prevent future discrimination or harassment.
>
> ● Mr. French will no longer be utilized as a guest teacher at Bruce Randolph

[Doc. 19-2 at 1].  The Close-Out Letter did not include any additional details about the allegations against Mr. French, nor did it include any specific findings.  [Doc. 1 at ¶¶ 50–51].  The Close-Out Letter also did not provide any additional information to explain why

or how no longer using Mr. French as a guest teacher at Bruce Randolph was a "necessary" action step.  [*Id.* at ¶ 51].

The Close-Out Letter also stated that the investigation was part of an "informal process" rather than a "formal Title IX grievance":

> Please note that neither party can be compelled to resolve a complaint of sex-based harassment, discrimination or retaliation informally, and either party may request an end to the informal process at any time.  Should you wish to end the informal process and proceed with a formal Title IX grievance, please contact me within seven (7) calendar days to make this request.

[*Id.* at ¶ 45]; *see also* [Doc. 19-2 at 1].  DPS policy requires voluntary, written consent to proceed informally.  [Doc. 1 at ¶ 55].  The Close-Out Letter falsely represented that Mr. French "met with the Title IX Coordinator (or Designee) and agreed that the Complainant's concerns would be best addressed via an informal process."  [*Id.*]; *see also* [Doc. 19-2 at 1].  However, Mr. French never received an explanation of the applicable policies, his formal and informal options, or his rights, nor did he agree to an informal process in writing.  [Doc. 1 at ¶ 55].

After Ms. Ames issued her Close-Out Letter, Mr. French requested a final report and details about the investigation, as well as a letter exonerating him so he could seek employment.  [*Id.* at ¶ 54].  These requests were ignored.  [*Id.*].  When the investigation concluded, Bruce Randolph failed to communicate that Mr. French was innocent.  The Close-Out Letter tainted Mr. French's personnel file and prevented him from securing employment anywhere else in DPS.  [*Id.* at ¶ 52].

***Impact on Coaching.***  Like many DPS employees, Mr. French's income from DPS was not sufficient for him to live in the Denver Metro area.  [*Id.* at ¶ 64].  Mr. French

supplemented his income by working as a basketball coach and referee at games, tournaments, and camps during evenings, weekends, and school breaks.  [*Id.*].

Because Bruce Randolph students and staff continued to spread unfounded rumors suggesting that Mr. French could not be trusted around young women, Mr. French has had difficulty securing the coaching and refereeing work that was a necessary supplement to his DPS income, and even more necessary after DPS discharged him from employment.  [*Id.* at ¶ 65].  When Mr. French has secured coaching and refereeing work, students and parents connected with Bruce Randolph have informed the individuals responsible for hiring him about their concerns regarding Mr. French.  [*Id.* at ¶ 66].  These concerns were based only on false allegations stemming from his employment with DPS. [*Id.*].

## II.    Procedural Background

Plaintiff initiated this lawsuit on June 23, 2023, asserting nine claims against DPS, including claims for race and national origin discrimination pursuant to 42 U.S.C. § 1981 ("Claim I") and Title VII ("Claim II"); sex discrimination pursuant to Title VII ("Claim III") and Title IX ("Claim VII"); retaliation claims under Title VII ("Claim IV") and § 1981 ("Claim V"); a Fourteenth Amendment equal protection claim under § 1981 ("Claim VI"); and discrimination and retaliation claims under the Age Discrimination in Employment Act ("ADEA") ("Claim VIII" and "Claim IX" respectively).  [Doc. 1].  Mr. French requests the following relief:  (1) declaratory and injunctive relief; (2) compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, mental anguish, loss of enjoyment of life, and other pain and suffering; (3) back pay and

benefits; (4) reinstatement or front pay and benefits; and (5) punitive damages on all claims allowed by law and in an amount to be determined at trial. [*Id.* at 23–24].

Defendant filed the instant Motion to Dismiss on September 18, 2023. [Doc. 19]. In the Motion, Defendant contends that Plaintiff's claims should be dismissed in their entirety because Plaintiff fails to state a claim upon which relief can be granted under Rule 12(b)(6). [*Id.* at 6–20]. Defendant also contends that Plaintiff fails to allege facts supporting a theory of municipal liability. [*Id.* at 3–6]. Plaintiff responded in opposition to the Motion, *see* [Doc. 25], and Defendant has replied, *see* [Doc. 28]. The matter is thus ripe for disposition and the Court considers the Parties' arguments below.

## LEGAL STANDARDS

### I.     Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a Rule 12(b)(6) motion, the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quotation omitted). The plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claims "across the line from conceivable to plausible"

(quotation omitted)).  The ultimate duty of the Court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."  *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

Defendant contends that each of Plaintiff's nine claims should be dismissed under Rule 12(b)(6) for failure to state a claim.  *See generally* [Doc. 19].  The Court first addresses whether Plaintiff has adequately alleged municipal liability to survive dismissal at the pleading stage.  In Section II, the Court considers the Parties' arguments with respect to the Title VII claims for hostile work environment and race and sex discrimination in turn.  In Sections III and IV, the Court considers Plaintiff's discrimination claims under Title IX and ADEA, respectively.  Finally, in Section V, the Court considers the Parties' arguments with respect to Mr. French's retaliation claims.

## I.    Municipal Liability

Mr. French's first and sixth claims for relief assert that DPS discriminated against him based on his race in violation of 42 U.S.C. § 1981 and the Equal Protection Clause. [Doc. 1 at ¶¶ 68–81, 122–35].  His fifth claim for relief asserts that DPS also retaliated against him for opposing discrimination in violation of § 1981.  [*Id.* at ¶¶ 113–121]. Defendant contends that Claims I, V, and VI must be dismissed for failure to plead facts to support municipal liability.  Specifically, Defendant points to Mr. French's failure to allege any DPS policy or custom of unlawful discrimination.  [Doc. 19 at 3–6].  Mr. French responds only by restating an allegation from his Complaint: "At all relevant times, DPS's discrimination against African Americans and men was a persistent or widespread

practice that constitutes the standard operating procedure of Defendant,  and . . . race discrimination and harassment was so widespread within DPS so as to constitute a custom or usage with the force of law."  [Doc. 25 at 5 (citing [Doc. 1 at ¶ 130])].

Section 1981 grants "[a]ll persons within the jurisdiction of the United States . . . the same right . . . to make and enforce contracts."  42 U.S.C. § 1981. Therefore, it "prohibits not only racial discrimination in the workplace but also retaliation against those who oppose discrimination." *Hannah v. Cowlishaw*, 628 F. App'x 629, 631– 32 (10th Cir. 2016) (brackets omitted) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 337, 355 (2013)).  To assert a violation of § 1981 against a municipality, a plaintiff must establish entity liability under § 1983 in addition to pleading race discrimination. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989); *Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006) (holding that the 1991 amendments to § 1981 did not overrule *Jett*).  Municipal liability under § 1983 requires the existence of an official policy or custom, a direct causal link between the policy or custom and the constitutional injury, and a showing that the defendant established the policy with deliberate indifference to an almost inevitable constitutional injury. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767–69 (10th Cir. 2013).  To establish an official policy or custom, a plaintiff may point to:  (1) a formal regulation or policy, (2) an informal custom that is so widespread it amounts to a custom or usage with the force of law, (3) a decision of an employee with final policymaking authority, (4) final policymakers' ratification of their subordinates' decisions, or (5) a failure to adequately train or supervise employees.  *See, e.g.*, *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

Like municipalities, school districts, as quasi-municipal agencies, can be sued "for depriving someone of constitutional or civil rights."  *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000).  In order for a school district or municipality to be held responsible for the unconstitutional act of an employee, the plaintiff must make certain showings. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").  First, the plaintiff must show that the employee's actions "were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action."  *Seamons*, 206 F.3d at 1029.  Second, the plaintiff must show that "there is a direct causal link between the policy or custom and the injury alleged."  *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).  Defendant challenges Plaintiff's municipal liability claims on the first prong.  *See* [Doc. 19 at 3–6].

***Scope of Alleged Actions Challenged by Plaintiff.***  As a threshold matter, the Court notes that the Complaint identifies three forms of "discriminatory intimidation, ridicule, and harassment" underlying Mr. French's municipal liability claims, including (1) "flagrantly false accusations regarding sexual touching of students," (2) "unfair discipline," and (3) "termination of his employment."  [Doc. 1 at ¶ 125].  The Court is disinclined to consider the first form of discrimination given that Mr. French alleges that he was falsely accused of sexually harassment and assault by *students*—not by DPS employees or officials.  Because students' false accusations against Mr. French are neither representative of an official DPS policy or custom nor carried out by an official with final policy making authority, they cannot plausibly support a municipal liability claim

against DPS.  Turning to the analysis of claims premised on discipline and termination, for the following reasons, the Court finds that Plaintiff fails to adequately state a claim that DPS can be held liable under a theory of municipal liability.

**No Formal or Written Policy.**  To begin, although Plaintiff summarily pleads that his "unfair discipline" and "termination" constituted discriminatory "policies, customs, and practices of DPS," [Doc. 1 at ¶ 129], Plaintiff does not allege the existence of a formal or written DPS policy to support his municipal liability claim.  *See also* [*id.* at ¶ 132 (alleging that various actions constituted "customs, policies, practices, and regiment of training of DPS")].  Moreover, DPS Board Policies AC, AC-R1, and AC-R3 expressly forbid the type of discrimination alleged by Plaintiff.  *See* [Doc. 19-1].  Thus, Plaintiff fails to sufficiently plead that DPS can be held liable due to an official policy.

**No Widespread Informal Policy or Custom.**[5]  Next, Plaintiff fails to sufficiently plead facts that, if true, "would give rise to a plausible inference that [an informal] policy exists."  *See Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015). In order to establish an informal policy or custom of misconduct, the plaintiff must demonstrate "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'"  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168 (1970)).  To demonstrate that Defendant had a "widespread" informal policy or custom of misconduct Plaintiff "cannot simply allege that there is a policy in place," but must plead "a pattern of multiple similar instances of misconduct."  *Griego*, 100 F. Supp. 3d at 1213.

---

[5] This appears to be the only theory of municipal liability advanced by Mr. French.

The Court finds that Plaintiff fails to plead any non-conclusory allegations of similar instances of discrimination and retaliation. *See generally* [Doc. 1]. Instead, Mr. French's Response merely points to a single allegation that "[a]t all relevant times, DPS's discrimination against African Americans and men was a persistent or widespread practice that constitutes the standard operating procedure of Defendant, and sex and race discrimination and harassment was so widespread within DPS so as to constitute a custom or usage with the force of law." [Doc. 25 at 5 (citing [Doc. 1 at ¶ 130])]. But the Complaint avers no facts that identify any other similar instances of conduct, the surrounding circumstances, or the identities of the decision-makers for the school district that purportedly perpetuated this "standard operating procedure." *See generally* [Doc. 1]. While "no set number" of multiple similar instances of misconduct are required, *Griego*, 100 F. Supp. 3d at 1213, Plaintiff's threadbare and conclusory statements are wholly insufficient to state a claim. *See Cano-Rodriguez v. Adams Sch. Dist. No. 14*, No. 19-cv-01370-CMA-KLM, 2020 WL 6049531, at *12–13 (D. Colo. Apr. 22, 2020) (dismissing §§ 1981 and 1983 claims against school district in part because allegations identifying six individuals who the plaintiff alleged suffered similar discrimination and retaliation were "threadbare and conclusory").

Because it is Mr. French's burden to establish a policy or custom, and he does not allege any other basis for entity liability, the Court could dismiss his claim without further analysis. *See City of Okla. City v. Tuttle*, 471 U.S. 808, 830 (1985) (the plaintiff bears the burden of establishing "the existence of a particular official municipal policy or established custom") (Brennan, J., concurring in part); *see also* [Doc. 25 (failing to respond to DPS's municipal liability arguments, including with respect to final policymaker authority over Mr.

French's termination)].  In sum, Mr. French fails to adequately state a claim for municipal liability against DPS, and thus, Claims I, V, and VI are **DISMISSED without prejudice under Rule 12(b)(6).**[6]

## II.    Title VII Discrimination Claims

The Court turns next to considering whether Plaintiff has stated a cognizable claim under Title VII, which provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, sex, . . . or national origin."  42 U.S.C. § 2000e–2(a).  He asserts theories of hostile work environment, disparate treatment based on his race and sex, and retaliation.  This Court considers each in turn.

### A.    Hostile Work Environment

Although Title VII makes no explicit mention of hostile work environment, "a victim of a racially hostile work environment may nevertheless bring a cause of action under Title VII." *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1138 (10th Cir. 2008) (quoting *Ford v. West*, 222 F.3d 767, 775 (10th Cir. 2000)).  "[H]ostile work environment harassment arises when [the alleged discriminatory conduct] 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an

---

[6] The Court does not reach Defendant's remaining arguments with respect to these claims.  In addition, Defendant seeks dismissal with prejudice.  *See* [Doc. 19 at 19; Doc. 28 at 11].  Plaintiff does not address this issue.  *See generally* [Doc. 25].  "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).  Because Defendant fails to establish that the defects identified in this Order cannot be cured by amendment, this Court concludes that dismissal without prejudice is appropriate.

intimidating, hostile, or offensive working environment.'" *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir. 1987) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).  Exposure to a hostile work environment is established when:  (1) a plaintiff is a member of a protected group; (2) a plaintiff has been subject to unwelcome harassment; (3) the harassment was based on the protected characteristic; and (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of the plaintiff's employment and created an abusive working environment. *Asebedo v. Kan. State Univ.*, 559 F. App'x 668, 670 (10th Cir. 2014).  "Isolated or trivial episodes of harassment are insufficient" to create a pervasively abusive environment, *Honeycutt v. Safeway, Inc.*, 475 F. Supp. 2d 1063, 1075 (D. Colo. 2007) (quotation omitted); rather, "there must be a steady barrage of opprobrious [discriminatory] comments," *Semsroth v. City of Wichita*, 304 F. App'x 707, 722 (10th Cir. 2008) (quotation omitted).

In evaluating a hostile work environment claim, the Court examines "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 897 (10th Cir. 2017) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).  "[A] [racially or] sexually objectionable environment must be both objectively and subjectively offensive."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  To survive a motion to dismiss, Plaintiff "must allege facts that make [his hostile work environment] claim at least plausible."  *Morman v. Campbell Cnty. Mem'l Hosp.*, 632 F. App'x 927, 933 (10th Cir. 2015).

DPS argues that Mr. French's hostile work environment claims should be dismissed because Mr. French "fails to plausibly plead sufficiently severe or pervasive words or conduct" so as to state a claim. [Doc. 19 at 13–16]. In his Response, Plaintiff fails to address Defendant's arguments for dismissal of his hostile work environment claims. *See generally* [Doc. 25]. Indeed, Mr. French mentions the words "hostile" and "pervasive" only once, in discussing a legal standard. [*Id.* at 3]. The Court is neither obligated nor permitted to construct legal theories on behalf of parties that they do not advance themselves—particularly when they are represented by counsel. *See United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that a court has no obligation to make arguments or perform research on behalf of litigants); *Carrillo v. New Mexico ex rel. Child., Youth & Fams. Dep't*, 405 F. Supp. 3d 1048, 1055 (D.N.M. 2019). Mr. French abandoned this theory of Title VII liability when he failed to argue in response to the motion to dismiss. *See Morman*, 632 F. App'x at 933.

Thus, insofar as it asserts a hostile work environment claim, Claim II is **DISMISSED without prejudice**.

## B.    Disparate Treatment

A prima facie case of Title VII race or sex discrimination requires evidence that: "(1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022) (quotation omitted). An "inference of discrimination" may be shown in various

ways, including "actions or remarks made by decisionmakers," "preferential treatment given to employees outside the protected class," or "the timing or sequence of events leading to plaintiff's termination." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (quotation omitted).

The United States Supreme Court made clear that at this early stage of litigation, "the requirements for establishing a prima facie case" of race or sex discrimination under Title VII do not "apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002). However, examining the prima facie elements is still relevant for determining whether the plaintiff has stated a plausible claim for such discrimination. *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) ("While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case [of race discrimination] in her complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim."). Thus, the Court begins by examining these elements.

### 1.     Adverse Employment Actions

Defendant first argues that Mr. French fails to allege any cognizable adverse action that he suffered because of his protected class.[7]   An adverse employment action is generally one that "constitutes 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Annett v. Univ. of Kan.*, 371 F.3d 1233,

---

[7] Defendant does not challenge the first element of Plaintiff's prima facie case with respect to race or sex discrimination.  Accordingly, the Court's analysis begins with the second element and asks whether Plaintiff's allegations plausibly allege a cognizable "adverse employment action."

1237 (10th Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)). Acts that carry a "significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" have also been considered to be adverse employment actions. *Id.* at 1239 (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996)); *see also Aquilino v. Univ. of Kan.*, 268 F.3d 930, 936 (10th Cir. 2001) (rejecting plaintiff's claim that denial of an appointment as a research associate constituted an adverse action when the alleged harm to her future employment prospects was speculative and rested solely in her untested belief in an alternative career path as a private scholar). However, a "mere inconvenience or an alteration of job responsibilities" will not suffice. *Annett*, 371 F.3d at 1239 (quotation omitted). "Not everything that makes an employee unhappy is an actionable adverse action." *Henrie v. Carbon Sch. Dist.*, No. 22-4015, 2023 WL 1948621, at *2 (10th Cir. Feb. 13, 2023) (cleaned up). Generally, "petty slights, minor annoyances, and simple lack of good manners do not qualify." *Id.* (quotation omitted). "Otherwise, minor and even trivial employment actions . . . would form the basis of a discrimination suit." *Id.* (quoting *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1216 (10th Cir. 2010) (alteration in original)).

In Response, Mr. French identifies the following adverse actions taken by DPS: (1) imposing undefined "discipline[]" on Mr. French for threatening to report discrimination, (2) placing Mr. French on paid administrative leave, (3) constructively demoting Mr. French by removing his ability to guest teach at Bruce Randolph, (4) falsely accusing Mr. French of sexual harassment and assault, and (5) terminating Mr. French's employment. *See* [Doc. 25 at 4–5]. The Court considers the Parties' arguments with respect to the allegedly adverse employment actions in turn.

20

*Imposing Discipline.*   In the Response, Mr. French asserts that, "[a]fter Mr. French explained the racial and physical abuse altered his ability to work and that he was going to report[] it[,] he was disciplined."  [*Id.* at 5 (citing [Doc. 1 at ¶¶ 97, 127])].  The basis for this assertion is unclear.  The allegations cited by Mr. French offer no factual support for the proposition.  *See* [Doc. 1 at ¶ 97 ("[T]he actions or omissions of Defendant DPS and its agents, supervisors, and employees were subjectively and objectively abusive, severe, or pervasive, and altered the terms and conditions of Mr. French's employment."); *id.* at ¶ 127 ("The harassment based on sex and/or race to which Defendant subjected Mr. French was pervasive and/or severe enough to alter the terms, conditions, or privileges of his employment and create a hostile or abusive work environment.")].  Moreover, the only "discipline" alleged in the Complaint is the "discipline" underlying Mr. French's claim of constructive demotion—i.e., that he was no longer permitted to guest teach at Bruce Randolph.  Insofar as Mr. French's claims are based on other unspecified actions, his Complaint lacks any supporting allegations.

*Paid Administrative Leave.*   DPS asserts that being placed on paid administrative leave is not an adverse employment action.  [Doc. 19 at 9 (citing *Lincoln v. Maketa*, 880 F.3d 533, 542 (10th Cir. 2018), and *Juarez v. Utah*, 263 Fed. App'x 726, 737 (10th Cir. 2008))].  In Response, Mr. French claims that his placement on paid administrative leave was an adverse action because he was "completely exonerated" of a student's allegations of sexual assault the day after the student complained.  [Doc. 25 at 4–5 (citing [Doc. 1 at ¶ 34])].   The basis for Mr. French's secondary assertion that, "after evidence fully exonerated Mr. French, he was unable to safely return to work for months," [*id.* at 5], is unclear, and his citation to his *entire* Complaint as support for the same is unhelpful.

Thus, this Court concludes that the Complaint lacks sufficient factual allegations to permit a factfinder to conclude that being placed on paid administrative leave constituted or led to an adverse action recognized under Title VII.

**Constructive Demotion.**   DPS argues that the removal did not constitute an adverse employment action because it "did not preclude French from serving as a guest teacher in any other school within the District."   [Doc. 19 at 9].   However, Mr. French contends that his removal as a guest teacher at Bruce Randolph constitutes a constructive demotion and "dramatically decrease[d] his earnings."   [Doc. 25 at 5 (citing [Doc. 1 at ¶ 49])].   While the proffered allegation does not state anything about the effect of guest teaching on Mr. French's earnings, support for the proposition that removal from guest teaching "reduc[ed] his income" appears elsewhere in the Complaint.   *See* [Doc. 1 at ¶ 52].   Mr. French alleges that he relied on income from coaching and refereeing to supplement his salary as a paraprofessional.   [*Id.* at ¶¶ 64–65].   Moreover, Mr. French's other roles at Bruce Randolph included that of paraprofessional, coach, guest teacher, and hall monitor.   [*Id.* at ¶ 12].   It is plausible that, by precluding Mr. French from guest teaching at the same school where he coached and worked as a paraprofessional, DPS effectively precluded Mr. French from guest teaching altogether.   Construing the facts in Plaintiff's favor, the Court finds that this adequately alleges an adverse employment action.

**False Allegations.**   Insofar as Mr. French claims that *DPS* "continually falsely accused [him] of touching female students," this assertion is not supported by the sole allegation on which he relies.   *Compare* [Doc. 25 at 5 (citing [Doc. 1 at ¶ 140])], *with* [Doc. 1 at ¶ 140 ("Mr. French, a Black man, was continually falsely accused of touching female

students.")].   The assertion also is belied by the allegations in Mr. French's Complaint. *See, e.g.*, [Doc. 1 at ¶¶ 34, 56–58].   The only individuals who allegedly accused Mr. French of touching female students were students.   While Mr. French alleges that Dean Kidane and Principal Boyd refused to "protect" him adequately after students falsely accused him of sexual misconduct on various occasions, [*id.* at ¶ 58], this not akin to affirmatively lodging accusations.   Similarly, Ms. Ames did not accuse Mr. French of sexual assault by merely restating the basis for the Title IX investigation into accusations raised by students against Mr. French.   *Cf.* [*id.* at ¶¶ 34, 49–50].   Moreover, as Defendant points out, Title IX obligates DPS to investigate accusations of sexual harassment and assault—even accusations that prove to be false.

**Termination.**   Although some details of the circumstances surrounding the termination of his employment remain unclear, Mr. French adequately alleges that he was ultimately terminated from DPS.   *See, e.g.*, [*id.* at ¶¶ 139, 141].

Construed in the light most favorable to Mr. French, the Complaint adequately alleges adverse employment actions of (1) his removal as a guest teacher at Bruce Randolph, and (2) his termination.   To survive dismissal under Rule 12(b)(6), however, Plaintiff must also allege facts sufficient to show that the circumstances surrounding one or more of these adverse actions give rise to an inference of discrimination motivated by race or sex animus.

### 2.    Race Discrimination

A Title VII plaintiff can plausibly allege an inference of discrimination by alleging that "the employer treated similarly situated employees more favorably."   *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011).   Defendant argues that Mr. French fails to

plead the fourth element of his disparate treatment claim because he asserts only conclusory allegations that he was treated less favorably than his non-Black counterparts. [Doc. 19 at 10; Doc. 28 at 7].   "Employees are similarly situated when they share a supervisor or decision-maker, must follow the same standards, and engage in comparable conduct."  *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).

According to DPS, Mr. French's allegations of less favorable treatment are nothing more than "conclusory allegations."   [Doc. 19 at 9].   Although Plaintiff argues in his Response that "[n]o non-black counterparts" were subject to certain treatment, [Doc. 25 at 5–6], the Court respectfully agrees with Defendant that the allegations at issue, even construed in Plaintiff's favor, do not adequately allege that other DPS employees were similarly situated to Plaintiff.

Here, Mr. French asserts that "[n]o non-black counterparts were falsely accused of sexual touching or assaults," "subject to sham investigations," or "subject to relentless racial slurs and taunts."  [*Id.* at 5–6].  Mr. French fails to present more than these vague allegations regarding his non-Black "counterparts" but, according to the Complaint, his "counterparts" could plausibly include teachers, guest teachers, coaches, paraprofessionals, and/or hall monitors.  [Doc. 1 at ¶¶ 10–12].  Plaintiff alleges no facts about his "counterparts"—"including whether they are also Paraprofessionals or whether they have the same supervisor as Plaintiff—that would allow the Court to compare the relevant employment circumstances."  *Aniniba v. Aurora Pub. Schs.*, No. 22-cv-03191-NYW-NRN, 2023 WL 6878369, at *3 (D. Colo. Oct. 18, 2023) (quotation omitted) (dismissing disparate treatment claim despite allegations that plaintiff's "colleagues" had

"not been disciplined by the Defendant" (emphasis omitted)).   Simply put, Plaintiff's allegations are too vague to support a reasonable inference of discrimination based on disparate treatment of similarly situated individuals.   *See Hakeem v. Denver Pub. Sch.*, No. 20-cv-00083-PAB-KLM, 2020 WL 4289422, at *6 (D. Colo. July 7, 2020) (paraprofessional plaintiff failed to adequately allege the fourth element of his discrimination claims against a defendant school district where the plaintiff asserted only a "conclusory allegation that he was treated unfavorably,"  and failed to allege any facts regarding individuals other than one student and one teacher evaluator), *report and recommendation adopted*, 2020 WL 4287191 (D. Colo. July 27, 2020).   Accordingly, absent proper identification of any similarly situated employees, the Court cannot find that Plaintiff has adequately alleged facts to support the fourth prong of the disparate treatment test.   *See id.*

Moreover, Plaintiff has not adequately alleged that any of the cognizable adverse employment actions, i.e., removal from guest teaching at Bruce Randolph or his termination, occurred under circumstances that otherwise give rise to an inference of unlawful discrimination.   *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019).   Plaintiff "does not [allege facts] that support[] an inference that [Defendant]" removed him from guest teaching, or "terminated him because of his race as opposed to other nondiscriminatory reasons."   *See Truman v. Brannan Sand & Gravel Co.*, No. 10-cv-00801-PAB-KLM, 2011 WL 5865047, at *5 (D. Colo. Nov. 22, 2011).   Beyond his conclusory allegations, Plaintiff pleads no facts to support a link between any alleged discriminatory conduct and his constructive demotion, or termination.   *See id.*; *see also Helsper v. Napolitano,* No. 11-cv-01804-MSK-BNB, 2012 WL 715555, at *2 (D. Colo. Mar.

5, 2012) (finding that dismissal was appropriate in an employment discrimination case where the plaintiff provided no "dates or descriptions of any of the adverse actions that befell her" and gave no "indication as to why she believes those actions were discriminatory"); *Plotke*, 405 F.3d at 1101 (listing circumstances that can give rise to an inference of discriminatory motive).

Because Plaintiff has not sufficiently alleged facts to support the fourth prong of the prima facie standard for Title VII discrimination, and he has not sufficiently alleged that his termination occurred under circumstances which give rise to an inference of unlawful discrimination, Plaintiff cannot make out a plausible Title VII race discrimination claim.

### 3.    Sex Discrimination

According to DPS, "repeated false allegations" against Mr. French and allegations that students spread rumors that Plaintiff was placed on administrative leave and/or terminated for having engaged in sexual harassment of students are insufficient to establish sex animus.  [Doc. 19 at 10, 15–16].  The Court respectfully agrees.

First, even assuming Defendant did know or should have known that the accusations against Plaintiff were false, Plaintiff fails to allege facts that plausibly demonstrate how the Title IX investigation or his constructive demotion amounts to sex discrimination.  Plaintiff alleges he was investigated and constructively demoted based on students' false accusations of sexual misconduct, not based on his status as a male. Notwithstanding Plaintiff's conclusory allegation that the "false allegations of touching were based upon his gender," [Doc. 1 at ¶ 141], Plaintiff pleads no facts to support his allegation that Defendant conducted its "sham investigation" or removed him as a guest

26

teacher *because* he is male.  *Cf. Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 367 (S.D.N.Y. 2016) (dismissing the plaintiff's claims and finding that to hold otherwise would "create a new right of action under which all students accused of sexual assault could bring a Title IX claim against their educational institutions—so long as they could plausibly plead that the accusations were known to the institution and that the institution failed to silence their accusers—simply because the misconduct they were accused of has a sexual element"); *see also Doe v. Univ. of Chicago*, 16-cv-08298, 2017 WL 4163960, at *7 (N.D. Ill. Sept. 20, 2017) ("a false accusation of sexual assault is not, without more, harassment based on sex, notwithstanding the sexual content of the accusation"); *Doe v. Hamilton Coll.*, No. 6:21-cv-00436-GTS-CFH, 2023 WL 8782020, at *25 (N.D.N.Y. Dec. 19, 2023) (after a female student accused the male student plaintiff of sexual assault and the plaintiff brought discrimination claims against school, "even assuming that [the female student's] complaint was false," there was no basis to find that the defendant school's "refusal to pursue a complaint against [the female student] was based on [the plaintiff's] sex – aside from the fact that case involved sexual misconduct").

Second, rumors or comments of a sexual nature are not necessarily discriminatory if the content of the comments is not in some way linked to the fact of the victim's sex. Courts have held that rumors regarding relationships in the workplace alone may not form the basis for a sex discrimination claim, absent evidence that the content of such rumors evidences a sex animus.  *See, e.g.*, *Dellefave v. Access Temps., Inc.*, No. 1:99-cv-06098-RWS, 2001 WL 25745, at *7 (S.D.N.Y. Jan. 20, 2001); *Pasqua v. Metro. Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996).  The Complaint does not indicate that the rumors were circulated by individuals evincing sex animus or that the content of the rumors was

particular to the male sex; rather, they appear to be in response to Plaintiff's absence from work, and the idle (and immature) minds of his co-workers, students, and students' parents.   While Plaintiff understandably found the rumors humiliating, it does not automatically follow that they are indicative of sex discrimination.  *Cf. Nash v. NY State Exec. Dep't,* No. 1:96-cv-08354-LBS, 1999 WL 959366, at *9 (S.D.N.Y. Oct. 20, 1999) (rumors that plaintiff was acting as a madam in a prostitution ring were sufficiently linked to her sex to establish a cause of action for a hostile work environment).   Plaintiff's allegations fail to show any link between the rumors and his sex that plausibly suggests that the rumors were motivated by sex animus.

Accordingly, Claim III is **DISMISSED without prejudice**.

## III.   Retaliation

To establish a claim for retaliation, the plaintiff must allege facts that plausibly show:  (1) he engaged in protected opposition to discrimination; (2) he suffered an action that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.  *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021).  Protected activity for the purposes of Title VII or ADEA retaliation includes either (1) participating in or initiating a Title VII or ADEA proceeding or (2) opposing discrimination made unlawful by Title VII or the ADEA.  *Boese v. Fort Hays State Univ.*, 814 F. Supp. 2d 1138, 1146 (D. Kan. 2011), *aff'd*, 462 F. App'x 797 (10th Cir. 2012).

Because this Court has already determined that the only cognizable "materially adverse" actions are Mr. French's constructive demotion and termination, *see supra*, its analysis focuses on the first and third prong of the test for retaliation.

***Protected Activity.***  DPS argues that Mr. French's retaliation claims fail because the only plausibly pled "protected activity" did not occur until March 2022, when Mr. French filed a charge with the Colorado Civil Rights Division ("CCRD").  [Doc. 19 at 17–18].  Mr. French alleges he engaged in protected activity "in 2021–2022" by "filing and notifying DPS of his CCRD Complaint."  [Doc. 1 at ¶¶ 107, 114].  As Defendant points out, *see* [Doc. 19 at 17], other than the CCRD charge filed in March 2022, *see* [Doc. 1 at ¶ 7], Mr. French does not specify when or to whom he reported the harassment or "racial transgressions" he suffered at the hands of students.

Mr. French alleges that he "made DPS aware of the harassment and the impact it was having on his life and career," but fails to elaborate.  [*Id.* at ¶ 18].  This is a bare, conclusory allegation that is not entitled to the presumption of truth.  Moreover, while Mr. French asserts that he "threatened to report . . . discriminatory behavior to his supervisors' superiors," and that Assistant Principal Valdez "explicitly told Mr. French not to report his discriminatory treatment," the allegations on which Mr. French relies do not say as much. *See* [Doc. 25 at 4 (citing [Doc. 1 at ¶¶ 21, 30)]].  The only specific example of a report by Mr. French to a supervisor relates not to the use of racial slurs but the use of physical force by a student.  [Doc. 1 at ¶ 21].  Elsewhere in the Complaint, Mr. French baldly alleges that he threatened to report "discriminatory treatment" to unnamed "supervisors" sometime "in or about 2021."  [*Id.* at ¶ 30].

Mr. French alleges that when he "complained about race, DPS Principal Melissa Boyd and Mr. Kidane used DPS security to bully him into silence."  [*Id.* at ¶ 29].  Mr. French does not explain how or when he complained "about race" to Principal Boyd or Dean Kidane, nor does he explain the ways in which Principal Boyd or Dean Kidane

"bull[ied] him" through DPS security.  *See* [*id.* at ¶ 31 ("Mr. Walker or Ms. Anderson would under report incidents to the Department of Safety in exchange for students harassing Mr. French.")].  Moreover, Mr. French does not explain how his complaints "about race" communicated a belief that DPS was discriminating against him.

Mr. French also asserts that "after [he] explained the racial and physical abuse altered his ability to work and that he was going to report, [sic] it he was disciplined." Again, the paragraphs to which Mr. French cites do not support this assertion.  *See* [Doc. 25 at 4 (citing [Doc. 1 at ¶ 97 ("the actions or omissions of Defendant DPS and its agents, supervisors, and employees were subjectively and objectively abusive, severe, or pervasive, and altered the terms and conditions of Mr. French's employment."), ¶ 127 ("The harassment based on sex and/or race to which Defendant subjected French was pervasive and/or severe enough to alter the terms, conditions, or privileges of his employment and create a hostile or abusive work environment.")])].  Moreover, Mr. French's vague and conclusory allegations about "complaints about race" and threats to report "discriminatory treatment" fail to plausibly show that he communicated a belief that DPS was engaging in unlawful race, sex, or age discrimination.  *Cf. Va. Transformer Corp. v. Ebbert*, No. 7:18-cv-00143-EJD-RSB, 2019 WL 1415467, at *4 (W.D. Va. Mar. 28, 2019) (retaliatory termination under Title VII insufficiently pled where plaintiff alleged that he "engaged in the protected activity of complaining about a discriminatory work environment" because plaintiff's vague allegations failed to "identify with sufficient particularity what the protected activity was or when it was" (cleaned up)); *Mayling Tu v. OppenheimerFunds, Inc.*, No. 1:10-cv-04971-PKC, 2012 WL 516837, at *10 (S.D.N.Y. Feb. 16, 2012) ("While an informal complaint to management may be protected activity,

the plaintiff offers no evidence that she communicated a belief that [the defendant] was discriminating against her.  Absent such evidence, plaintiff's [complaints] do not support a retaliation claim." (citations omitted)); *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (vague charge of discrimination in an internal letter or memorandum was insufficient to constitute opposition to an unlawful employment practice); *cf. Balding-Margolis v. Cleveland Arcade*, 352 Fed. App'x 35, 45 (6th Cir. 2009) (vague claim in affidavit that the plaintiff reported sex- and age-based harassment, which was not supported by record evidence and was contradicted by plaintiff's prior deposition testimony, insufficient to establish plaintiff engaged in protected activity); *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (vague allegation to manager of ethnocentrism insufficient to constitute protected activity); *Yomi v. Dejoy*, No. 21-cv-02709-ABA, 2024 WL 1075422, at *2 (D. Md. Mar. 12, 2024) (finding allegation that plaintiff "communicated discrimination" to a particular individual conclusory and concluding that the plaintiff had "not explained what the alleged protected activity was, other than in a vague, general, and conclusory (and thus non-cognizable) way"), *appeal docketed*, No. 24-1349 (4th Cir. Apr. 23, 2024).

Accordingly, except for the CCRD Complaint, the Court declines to find that any of the foregoing allegations sufficiently allege protected opposition, which requires that an employee convey to his employer a concern that the employer has engaged in unlawful discrimination.  *See Hinds v. Sprint/United Mgmt. Co.,* 523 F.3d 1187 (10th Cir. 2008).

*Causal Connection.*  DPS argues that Mr. French's retaliation claim fails because his March 2022 CCRD Complaint was filed "after the District advised French of its decision to eliminate his position due to budget constraints in February 2022."  [Doc. 19

at 17].  To engage in unlawful retaliation, an alleged retaliator must at least know of an employee's protected activity.  *Zokari v. Gates,* 561 F.3d 1076, 1081 (10th Cir. 2009).  Here, the Close-Out Letter that resulted in Mr. French's removal as a guest teacher at Bruce Randolph was dated and received on February 7, 2022.  [Doc. 1 at ¶ 45; Doc. 19-2 at 1].  There is simply no chronological way that Mr. French's March 2022 CCRD Complaint could have caused the demotion and/or constructive discharge that occurred a month before.  Thus, Claims IV, V, and IX are **DISMISSED without prejudice** under Rule 12(b)(6).

## IV.    Title IX Discrimination

Title IX of the Education Amendments Act of 1972 provides similar protections to Title VII.  It prohibits discrimination "on the basis of sex" in educational programs or activities receiving federal funding.  20 U.S.C. § 1681(a).  This includes a prohibition on employment discrimination in federally funded educational programs.  *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535–36 (1982).  Title IX also prohibits retaliation against individuals because they have complained of sex discrimination.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (interpreting Title IX as creating a private right of action for such a claim); *see also Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315–16 (10th Cir. 2017).

Title IX "bars the imposition of university discipline where [sex] is a motivating factor in the decision to discipline."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  DPS frames its arguments under the analytical framework set forth in a number of higher education Title IX misconduct cases.  This framework recognizes two theories of Title IX liability:  "erroneous outcome" and "selective enforcement."  *Id.*; *see also Haidak v. Univ.*

*of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019) (recognizing "erroneous outcome" and "selective enforcement" theories of liability); *Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019) (same); *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (same); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018) ("erroneous outcome" only).  Under the "erroneous outcome" test, a plaintiff must set forth (1) "facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) "a particularized allegation relating to a causal connection between the flawed outcome and gender bias."  *Yusuf*, 35 F.3d at 715.  To satisfy the "selective enforcement" test, a plaintiff "must show that a similarly[ ]situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Doe v. Univ. of Dayton*, 766 F. App'x 275, 284 (6th Cir. 2019).

The Tenth Circuit has "declined to superimpose these analytical tests onto Title IX" because "[a]ll of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student."  *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021) (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019), and collecting cases).  Instead, the Court must "ask the question more directly:  do the facts alleged, if true, raise a plausible inference that the [school] discriminated against [the plaintiff] 'on the basis of sex'?"  *Id.* (quoting *Purdue Univ.*, 928 F.3d at 667–68).  Allegations of an erroneous outcome or selective enforcement are means by which a plaintiff might show that sex was a motivating factor in a school's disciplinary decision.  *Id.*

Defendant argues that Mr. French's Title IX claims must be dismissed for the same reasons his Title VII sex discrimination claim fails and, to the extent Mr. French raises an

erroneous outcome claim, because Mr. French fails to allege facts casting articulable doubt on the outcome of DPS's Title IX investigation or showing the influence of sex bias. [Doc. 19 at 19–20].   Defendant argues that Mr. French fails to plausibly plead facts casting articulatable doubt on the outcome of the Title IX investigation.  [*Id.* at 19 (citing *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 91 (1st Cir. 2018), and *Yusuf*, 35 F.3d at 715)]. However, Defendant's arguments rely primarily on facts and assertions that are not contained in the Complaint.  For example, Defendant asserts that,

> After speaking with both French and the complainants, [Title IX Investigator] Ames ascertained that the students' allegations were unfounded.  Ultimately, the investigation concluded in a finding that no District policy or handbook violation had occurred.  The District decided that no longer utilizing French as a guest teacher at the school would be sufficient to resolve concerns and minimize the opportunity for the complaining students to interact with, or harass, French.

[*Id.* at 19–20]; *see also* [*id.* at 20 ("Because the results of the investigation were unfounded, French cannot satisfy either element of an erroneous outcome claim because there was no finding of wrongdoing.")].[8]  However, the Close-Out Letter does not state that the investigation concluded with a finding that the students' allegations were "unfounded."  *See* [Doc. 19-2].  Nor does the Close-Out Letter explain that Mr. French's removal from guest teaching at Bruce Randolph was designed to protect Mr. French from discrimination or harassment.  To the contrary, the Letter states that, to resolve the concerns raised in the *student complaint*—e.g., Mr. French's alleged misconduct toward female students—he would no longer serve as a guest teacher.  [*Id.*].   Accepting

---

[8] Defendant also argues that "[d]espite being authorized to return to work starting February 8, 2022, he declined and decided to go out on medical leave for the remainder of the school year."  [Doc. 19 at 20].  This information does not appear within the four corners of the Complaint.  The exhibits properly before the Court also do not contain this information.

Defendant's arguments would require the Court to construe allegations in Defendant's favor, draw inferences in Defendant's favor, and find facts in Defendant's favor, all of which this Court cannot do.  *Casanova*, 595 F.3d at 1124.

Yet Mr. French's Response again fails to address the legal arguments raised in the Motion to Dismiss.  As DPS points out in its Reply, Mr. French's Response "merely iterates a formulaic recitation of the legal elements of his Title IX . . . claim[] without any factual development or legal argument."  [Doc. 28 at 10].  With respect to his Title IX claim, Mr. French cites boilerplate language about Title IX, *see* [Doc. 25 at 8], and claims—without citation or reference to other sections of his Response or Complaint—that he "already demonstrated within [his] Response how those elements have been plausibly alleged," [*id*.].

Notwithstanding the lack of argument by Mr. French's counsel in response to the instant Motion, the Court considers whether Mr. French's allegations, taken as true, raise a plausible claim of Title IX discrimination.  The Court concludes that Mr. French's allegations of procedural irregularities in the Title IX investigation give rise to an inference of bias, *see Purdue Univ.*, 928 F.3d at 670 (reversing Rule 12(b)(6) dismissal of plaintiff's Title IX claim where procedural irregularities gave rise to inferences of bias).  However, because the Court finds no basis from which it can infer that the bias is *based on sex*, Mr. French fails to state a cognizable claim under Title IX.

If procedural irregularities are sufficiently numerous, lopsided, and/or important, they can sometimes support an inference of sex discrimination.  *Purdue Univ.*, 928 F.3d at 669; *accord Doe v. Univ. of Denver*, 1 F.4th at 831–34.  But a plaintiff cannot prove sex discrimination by merely identifying mistakes or imperfections in the process.  *Doe v.*

*Samford Univ.*, 29 F.4th 675, 688 (11th Cir. 2022) ("A deviation from a Title IX policy is not, in and of itself, a violation of Title IX.").  "[A]s the number of irregularities increases, or the irregularities become more serious," it begins to look less likely that the errors were due to benign reasons.  *Id.* at 697–98 (Jordan, J., concurring) (collecting cases).

On this point, the Court finds *Purdue University* persuasive.  The plaintiff in that case alleged what amounted to a sham grievance process.  928 F.3d at 669.  He alleged that the school's Title IX committee found that he committed sexual assault despite never hearing directly from the other party.  *Id.*  The accusing party did not provide her own account either in writing or orally.  *Id.*  According to the plaintiff, however, the panel relied solely on a letter submitted on her behalf by a university employee to find that her charge was more credible than his denial.  *Id.*  In addition, under the procedures used at the time, the Title IX coordinator did not give the plaintiff a copy of the investigative report or share its contents with him.  *Id.* at 660.  The plaintiff allegedly received only a redacted version of the investigative report, and that only a few minutes before the hearing, when he learned it "falsely claimed that he had confessed to [the other party's] allegations."  *Id.* at 657.  Further, the investigative report did not include favorable evidence that he had submitted, he was barred from presenting witnesses, and two of the three administrators on the panel admitted that they had not even read the investigative report.  *Id.* at 657–658.  In reversing dismissal on the pleadings, the Seventh Circuit concluded that such significant and slanted procedural irregularities could, if proven, support an inference of bias.  *Id.* at 669–70; *see also Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) (noting that the logic of precedent involving student-on-student claims under Title IX applies equally to cases involving employees).

As in *Purdue University*, here Mr. French has pleaded facts that, when taken as true, reflect a clearly irregular investigative and adjudicative process.  First, Mr. French alleges that DPS failed to interview relevant witnesses whom he brought to the Title IX Coordinator's attention.   Second, Mr. French alleges that he was disciplined and subsequently terminated despite the fact that various DPS officials, including Principal Boyd and Dean Kidane, knew that at least two of the accusations against him were false.  Similarly, Mr. French alleges that DPS knew and withheld from him the fact that the complaining student recanted the day after accusing him of sexual assault and admitted that her allegations were part of "conspiracy to get Mr. French fired."  Third, despite Mr. French's post-investigation requests to would receive a report on DPS's investigation, he received no such report.

Fourth, Mr. French alleges that DPS completely disregarded the process provided for in its written policies.  [Doc. 1 at ¶ 45].  For example, Mr. French alleges that the Close-Out Letter falsely represented that he "met with the Title IX Coordinator (or Designee) and agreed that the Complainant's concerns would be best addressed via an informal process."  [*Id.* at ¶ 55].  DPS policy requires voluntary, written consent to proceed informally, but Mr. French never received an explanation of the applicable policies, his formal and informal options, or his rights, nor did he agree to an informal process in writing.  [*Id.*].  Indeed, according to Board Policy AC-R3, DPS "will not offer or facilitate the Informal Resolution Process to resolve allegations that an employee sexually harassed a student."  [Doc. 19-1 at 20].

Moreover, Board Policy AC-R3 provides for a formal "Grievance Process," which requires that DPS's Title IX Coordinator interview potential witnesses, provide

respondents the opportunity to submit a written response, and produce a written determination of reasonable cause.  [*Id.* at 19–20].  Mr. French claims that he received none of these procedural protections.  Thus, as with the allegations in cases like *Purdue University*, Mr. French's removal as a guest teacher and subsequent termination under such circumstances strongly suggests the presence of bias.  *See, e.g.*, *Menaker*, 935 F.3d at 34–35 (reversing dismissal where plaintiff alleged, among other things, that school did not interview potential witnesses, give plaintiff the investigative report, allow him to file a written response, or produce a written decision of responsibility); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 951 (9th Cir. 2020) (plaintiff alleged school provided him only an oral account summarizing the complainant's allegations, "failed to consider his version of the alleged assault," did not follow up with any of his witnesses or the "evidence he offered in his defense," found the plaintiff responsible without providing him "any access to evidence or considering his exculpatory evidence," and finally suspended him based on additional accusations "to which he was not given an opportunity to respond").

Fatal to Mr. French's claim, however, is the lack of any circumstances to suggest that this bias was sex-based.  *Cf. Menaker*, 935 F.3d at 31 (noting that procedural deficiencies in investigation and adjudication of sexual assault complaint raised inference of bias generally and—*together with* allegations that the school was criticized for not taking female student's allegations of assault by male students seriously—plausibly supported "at least the needed minimal inference" that the bias *was gender-based*).  Unlike the foregoing cases, here Mr. French fails to allege any non-conclusory facts to suggest any sex-based motivation.  His entirely conclusory allegations that he "was subject to sex-based discrimination" and "false allegations of touching . . . based on his

gender," [Doc. 1 at ¶¶ 138, 141], are not entitled to the presumption of truth and fall short of plausibly suggesting that any bias was sex motivated. *Cf. Menaker*, 935 F.3d at 33 n.48 ("It is precisely because procedural irregularity alone already suggests bias that even minimal evidence of *sex-based pressure* on the university is sufficient to establish bias on account of sex." (emphasis altered)); *Doe v. Oberlin Coll.*, 963 F.3d 580, 586–88 (6th Cir. 2020) (concluding that the plaintiff had "amply stated a claim for sex discrimination" where there were "clear procedural irregularities," the "Department of Education's Office of Civil Rights was engaged in a systemic investigation of the College's policies," and the "facts of the case cast . . . doubt on the accuracy of the disciplinary proceeding's outcome" (quotations omitted)); *Doe v. Univ. of Ark.*, 974 F.3d 858, 865 (8th Cir. 2020) (concluding that a "dubious [disciplinary] decision . . . taken against the backdrop of substantial pressure on the University to demonstrate that it was responsive to female complainants" supported "an inference that a university is biased based on sex"); *Doe v. Univ. of Denver*, 1 F.4th at 831.

Accordingly, Claim VII is **DISMISSED without prejudice**.

## V.    ADEA Discrimination

Defendant argues that Mr. French's ADEA discrimination claim should be dismissed for failure to state a claim because he relies on conclusory allegations and has not alleged that his age was the but-for cause of any adverse action.  Specifically, Defendant argues that Mr. French fails to specifically allege which "difficult and demeaning job responsibilities" he was assigned, or which aspects of his work were scrutinized because of his age.  [Doc. 19 at 11].  Defendant also asserts that Mr. French's claim that he was "not allowed to interview" for a paraprofessional position is "meritless"

because Mr. French was employed as a paraprofessional at Bruce Randolph.  [*Id.*].  In one short paragraph, Mr. French responds with a single citation to legal authority (reciting the elements of an age discrimination claim) and restates the few age-related allegations in his Complaint.  [Doc. 25 at 8–9].  He provides no further legal argument or analysis in response to Defendant's Motion with respect to dismissal of his claims under the ADEA. The Court agrees with Defendant and finds dismissal of Plaintiff's age discrimination claim warranted.

The threadbare allegations set forth in the Complaint, *see* [Doc. 1 at ¶¶ 59, 143–45], fall short of stating an age discrimination claim.  And while Mr. French asserts in his Response that his "position was filled by a younger person," [Doc. 25 at 9], this is not what he alleges in his Complaint.  *Compare* [*id.* (citing paragraph 144 of the Complaint for the proposition that "his position was filled by a younger person")], *with* [Doc. 1 at ¶ 144 ("DPS subjected Plaintiff to less favorable terms and conditions of employment based on his age" by, inter alia, "hiring younger paraprofessionals without allowing Plaintiff to interview for the position . . . and ultimately eliminating his position.")].  Indeed, even if Mr. French could properly introduce new allegations in his Response (he cannot), the assertion that he was replaced by a younger paraprofessional is implausible considering Mr. French's allegation that DPS *eliminated* his position.  *See* [Doc. 1 at ¶ 144]; *see also Johnston v. Hunter Douglas Window Fashions, Inc.*, 715 F. App'x 827, 829–30 & n.4 (10th Cir. 2017) (affirming district court and noting that "it found Mr. Johnston failed to allege facts sufficient to infer that . . . his job was filled by a younger person," and "found [the plaintiff's] statement conflicted with other allegations in the complaint").

In sum, Mr. French fails to allege facts sufficient to infer that his job was filled by a younger person.  Accordingly, the Court finds that Mr. French's age discrimination claim must be dismissed for failure to state a claim.  The Motion to Dismiss is thus **GRANTED** and Claim VIII is **DISMISSED without prejudice** under Rule 12(b)(6).

### CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendant's Motion to Dismiss Plaintiff's Complaint [Doc. 19] is **GRANTED**;

(2)    Claims I–IX are **DISMISSED without prejudice** for failure to state a claim under Rule 12(b)(6); and

(3)    To the extent that he seeks to amend his Complaint, Plaintiff may file an appropriate motion, after a robust meet and confer with Defendant, **no later than July 16, 2024**.[9]

DATED:  July 2, 2024                    BY THE COURT:

Nina Y. Wang
United States District Judge

---

[9] Plaintiff does not request leave to amend in his Response to the Motion to Dismiss and has not filed a Motion to Amend.  *See* [Doc. 25].  "Absent a request to amend, a district court may dismiss the action rather than sua sponte granting leave to amend."  *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1256 (10th Cir. 2024).  Nevertheless, in light of the types of concerns raised by Mr. French in his Complaint, and a determination that his claims are not necessarily futile, this Court sua sponte grants leave to Plaintiff to file a motion seeking to amend only after a robust meet and confer with Defendant.  Should Plaintiff seek amend, he must comply with the applicable Federal Rules of Civil Procedure, Local Rules of Civil Practice, and Uniform Practice Standards.  Should Plaintiff not seek amendment by the deadline, this Court will direct the Clerk of Court to close this case and award costs to DPS under Rule 54 and Local Rule 54.1 without further notice.